***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. Plaintiff's alleged date of injury is April 1, 2002.
2. On that date, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
3. On that date, an employer/employee relationship existed between the parties.
4. Gallagher Bassett Services was the carrier on the risk.
5. Plaintiff's average weekly wage at the time of the alleged injury on April 1, 2002, was $970.33, yielding a compensation rate of $646.92, as calculated from the Form 22 Wage Statement.
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 41 years old. Plaintiff was in the United States Air Force for 15 years and served in Operation Desert Shield.
2. Plaintiff had been employed by defendant-employer for five and one-half years and had worked as a forklift driver, warehouse worker, bundle machine operator and reprocessing mill machine operator. On April 1, 2002 plaintiff worked in the tubing department.
3. On April 1, 2002, a dispute arose between plaintiff and a co-worker, Jackie Richardson, over work duties. The argument began after plaintiff directed Mr. Richardson to correct problems with material feeding through a machine. At the conclusion of the argument, Mr. Richardson continued to work at his machine and plaintiff called their supervisor, Mickey Davis, to the tubing department to settle the dispute.
4. Upon Mr. Davis' arrival in the tubing department, the three workers stood approximately three to four feet apart during their discussion of the events leading up to the dispute. At this time, Mr. Richardson was leaning back on the "belly bar" to the reprocessing machine with a mill knife in his hand, with which he had been working prior to Mr. Davis' arrival. The knife has a four-inch handle with a two-inch blade and is used to cut rubber in the operation of defendant's business.
5. During the course of the discussion, Mr. Richardson stated that he was tired of plaintiff "messing with" him. Mr. Richardson stated that he worked with the mill knife and that he should just stick plaintiff with the knife and then retire from the employment. Plaintiff became very upset about Mr. Richardson's comments. Mr. Davis instructed the men to shut down the machine and for plaintiff to go into the office.
6. Mr. Davis called the crew manager, Phil Hedgepath, to talk to Mr. Richardson. The decision was made to separate plaintiff and Mr. Richardson for the rest of the night and each continued to work the rest of their shift in different departments.
7. Following their shift, plaintiff and Mr. Richardson met individually with the Human Resources manager, Doug Winstead, regarding the incident and each worker gave his version of the confrontation. The evidence shows that prior to this meeting plaintiff and Mr. Richardson apologized and shook hands and following the meeting the two men left the plant at the same time.
8. In addition to Mr. Richardson's remark, the subject of a safety violation committed by plaintiff on March 30, 2002, was also discussed at the meeting between Mr. Winstead and plaintiff on April 1, 2002. The safety violation involved an incident wherein plaintiff failed to properly "tag out" the reprocessing machine when he placed his hand near the machine to remove a rubber jam. Plaintiff was told the violation would be investigated and a meeting was scheduled to discuss the violation. According to Mr. Davis, the likely penalty for such an infraction was a three-day suspension.
9. Following the incident with Mr. Richardson on April 1, 2002, plaintiff experienced nightmares and was agitated and nervous.
10. On April 3, 2002, plaintiff approached Mr. Winstead to voice his fear of Mr. Richardson and to discuss the pending investigation and penalty for his "lock-out/tag-out" violation. Mr. Winstead advised plaintiff that he and Mr. Richardson would not be separated into different work areas. Mr. Winstead's notes from the meeting confirm that plaintiff was very upset and visibly shaken. Plaintiff's symptoms increased and he first experienced symptoms of a panic attack.
11. After the April 3, 2002 meeting Mr. Winstead referred plaintiff to the company's Employee Assistance Program based on the apparent stress plaintiff experienced. Mr. Winstead testified that he had intended to make this referral prior to April 1, 2002, based on personal and family issues causing stress in plaintiff's life. Plaintiff and his wife were separated and having disputes about custody of their son.
12. Prior to the incident at work with Mr. Richardson, plaintiff was evaluated by pyschologist Kurt Luedtke on January 23, 2002, to determine whether plaintiff had any psychological problems which would preclude him from obtaining child custody or visitation rights. It was Dr. Luedtke's opinion that no such problems existed and that plaintiff's mental functioning was normal. Plaintiff did not present with any symptoms of panic disorder, post-traumatic stress disorder or depression. Plaintiff communicated to Dr. Luedtke that defendant-employer had recommended that he be seen for anger management.
13. Following the incident with Mr. Richardson, plaintiff was evaluated by his current treating psychiatrist, Dr. Kathy Mayo, on May 1, 2002. Based on his account of the incident and his reported symptoms thereafter, Dr. Mayo diagnosed plaintiff with post-traumatic stress disorder (PTSD), depression and panic disorder.
14. Dr. Mayo stated that plaintiff's psychological conditions were caused by the confrontation with Mr. Richardson and the subsequent meeting regarding the incident which aggravated plaintiff's psychological conditions. According to Dr. Mayo, "[t]he mechanism of injury would have been the knife being pulled on him [plaintiff] at work, which to him was perceived as life-threatening because the man did threaten him; and then after this happened, he went to get help from his supervisor, and he was told he had to just go back to work and keep working with the man who threatened him." Dr. Mayo testified that but for the unusual and extraordinary incident with Mr. Richardson, it was unlikely that plaintiff would have developed the mental problems that he experienced. In Dr. Mayo's opinion, the incident on April 1, 2002 could be characterized as a psychiatric trauma.
15. Dr. Mayo also stated that the onset of plaintiff's symptoms was due to causes and conditions characteristic of and peculiar to his particular employment and which exposed him to a greater risk of contracting these psychological conditions than the general public. Dr. Mayo felt that plaintiff was disabled from any employment and needs continuing psychiatric or psychological treatment. Because of financial constraints in that plaintiff's claim was denied by defendants and plaintiff was paying for Dr. Mayo's limited treatment on his own, plaintiff's psychiatric treatment has not been adequate or appropriate to deal with and improve his psychological conditions.
16. On June 17, 2003 plaintiff underwent an independent medical evaluation by a psychiatrist, Dr. Moira Artigues. Dr. Artigues diagnosed panic disorder with agoraphobia and somatoform disorder. It was Dr. Artigues' opinion that the April 1, 2002 episode between plaintiff and the co-worker did not qualify as a traumatic event under the DSM-IV
criteria for a finding of PTSD. However, Dr. Artigues stated that the incidents of April 1 and April 3, 2002 provoked plaintiff's anxiety and caused the "declaration" of the underlying panic disorder which was a genetic trait but asymptomatic prior to the incidents. The work incident and meeting were contributing factors in the onset of plaintiff's symptoms, but Dr. Artigues believed that other factors also contributed.
17. Prior to his deposition in this matter, Dr. Luedtke reviewed the medical records and the IME report of Dr. Artigues and agreed with Dr. Artigues' diagnosis and did not believe plaintiff was suffering from PTSD but rather panic attacks, which are very different from PTSD. On his review of Dr. Mayo's treatment, it was Dr. Luedtke's opinion that treatment for plaintiff had not been adequate. Dr. Luedtke could not say that the incident of April 1, 2002 played a role in the onset of plaintiff's symptoms and emphasized that the sequence of events did not necessarily relate causation of the events to the panic disorder.
18. The Commission gives greater weight to the expert medical opinions of plaintiff's treating psychiatrist Dr. Mayo than to the opinions of Dr. Artigues, a psychiatrist, and Dr. Luedtke, a psychologist, who both saw plaintiff only once.
19. The Commission finds that plaintiff experienced an interruption of his normal work routine and the introduction of unusual conditions likely to result in unexpected consequences when threatened with a knife by his coworker on April 1, 2002. This incident and the subsequent meeting with his supervisor on April 3, 2002 resulted in plaintiff developing a post-traumatic stress disorder, panic disorder and depression.
20. As of the Deputy Commissioner's hearing, plaintiff continued to have nightmares of Mr. Richardson stabbing him, as well as flashbacks, anxiety attacks, feelings of loss of control and not being able to function while performing everyday activities.
21. Since April 3, 2002 plaintiff has been totally disabled from his pre-injury employment at defendant-employer and from any competive employment as the result of his psychological conditions. Plaintiff has not reached maximum medical improvement and requires more extensive and aggressive psychiatric or psychological treatment.
22. From April 3, 2002 through June 1 2002 plaintiff received 100% salary continuation at a monthly rate of $3,561.84. From June 2, 2002 through July 31, 2002 plaintiff received 60% salary continuation at a monthly rate of $2,068.00. From August 1, 2002 until January 31, 2003 plaintiff received short-term disability benefits at a weekly rate of $331.02. Plaintiff was terminated by defendant-employer effective April 2, 2003.
22. This claim was defended upon reasonable grounds.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The incident between plaintiff and Mr. Richardson on April 1, 2002, constituted an unlooked for and untoward event which was not expected or designed by plaintiff. The threatened assault by Mr. Richardson was an interruption of the work routine and an introduction of unusual conditions likely to result in unexpected consequences and therefore constituted an "accident" as defined by the Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6); Jordan v. Central Piedmont Community College,124 N.C. App. 112, 476 S.E.2d 410 (1996). An accident arises out of the employment when an injury occurs because of a dispute between employees about the manner of doing the work they are employed to do. Withers v.Black, 230 N.C. 428, 53 S.E.2d 668 (1949).
2. As the result of the compensable injury by accident on April 1, 2002 plaintiff is temporarily totally disabled and entitled to receive temporary total disability compensation at the rate of $646.92 per week beginning April 3, 2002 and continuing until plaintiff returns to work earning the same or greater wages or until further Order of the Commission. N.C. Gen. Stat. § 97-29. Defendants are entitled to a credit for the salary continuation and disability payments made to plaintiff pursuant to the terms of N.C. Gen. Stat. § 97-42.
3. Plaintiff is entitled to payment of expenses for any reasonably necessary medical treatment incurred or to be incurred as the result of the injury by accident on April 1, 2002. N.C. Gen. Stat. §§ 97-25, 97-25.1. Dr. Mayo is approved as plaintiff's treating physician and the treatment plan recommended for plaintiff by Dr. Mayo shall be provided by defendants.
4. Defendants defended this matter on reasonable grounds as there were legitimate issues for hearing. N.C. Gen. Stat. § 97-88.1; Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to attorney's fees awarded below, defendants shall pay plaintiff temporary total disability compensation at the rate of $646.92 per week beginning April 3, 2002 and continuing until plaintiff returns to work earning the same or greater wages or until further Order of the Commission. Compensation which has accrued shall be paid in a lump sum.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his April 1, 2002 injury by accident, including all reasonable medical treatment recommended by Dr. Mayo.
3. A reasonable attorney's fee of 25% of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs due this Commission.
This the 10th day of March 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mb